696 So.2d 672 (1997)
Asia Jane HARVEY
v.
AMOCO PRODUCTION COMPANY.
No. 96 CA 1714.
Court of Appeal of Louisiana, First Circuit.
June 20, 1997.
*674 Bobby L. Forrest, Baton Rouge, for Plaintiff/Appellant Asia Jane Harvey.
J. Clayton Johnson, Baton Rouge, for Defendant/Appellant Amoco Production Company.
Robert W. Scheffy, Jr., Baton Rouge, for Defendant/Appellee Robert Scott Davis.
Joseph P. Brantley, IV, Baton Rouge, for Defendants/Appellees Edna J. Assel, Sylvia W. Assel, Allen J. Assel, Edna A. Carden, C.T. Carden, Joan Baldo, and Edward F. Baldo, Jr.
Before WHIPPLE and FITZSIMMONS, JJ., and TYSON, J. Pro Tem.[1]
WHIPPLE, Judge.
This case concerns a disputed mineral lease entered into by plaintiff, Asia Jane Harris Harvey, with defendant, Amoco Production Company, on August 20, 1977. The mineral lease affected a tract of land in Port Hudson, Louisiana, which had been purchased on June 20, 1951, by plaintiff and nine of her relatives (eight siblings and one nephew) from plaintiff's uncle, Willie Jackson, by Act of Cash Sale. In the Act of Cash Sale, plaintiff, along with the other purchasers of the property, declared, "all of said parties purchasing herein with their separate paraphernal funds, under their separate management and control and for their separate estate." At the time of the sale, plaintiff was married to Clarence Harris. Harris did not sign the deed acknowledging the plaintiff's declaration.[2] Harris subsequently leased the property to Amoco Production Company on January 23, 1979. He alleged in the lease that he was divorced. He later sold the lease to Robert Scott Davis on March 13, 1979.
On May 15, 1979, Amoco began making royalty payments to plaintiff based on a 1/20th (one-twentieth) interest; the other co-owners of the property received royalty payments based on a 1/10th (one-tenth) interest. At that time, the family learned that plaintiff's checks were for one-half of the amount that other family members were receiving because Amoco was paying Clarence Harris, plaintiff's first husband, one-half of her interest.
Eleven years later, on September 18, 1990, plaintiff's attorney notified Amoco by letter that royalty payments due her under her lease were being paid erroneously to Robert Scott Davis, Clarence Harris' successor in interest, and that plaintiff desired full payment for her leased interest. Amoco did not respond favorably, and on November 27, 1990, plaintiff filed a "Petition to Dissolve Mineral Lease for Failure to Comply with Obligations" against Amoco Production Company. She subsequently filed an amended petition on May 24, 1991, naming Clarence Harris' successors in interest as defendants, after the court ruled they were indispensable parties to the litigation.[3]
*675 On December 6, 1991, Amoco Production Company filed a motion for summary judgment asserting there was no genuine issue of material fact and that as a matter of law, Amoco owed no further accounting to plaintiff as Amoco was entitled to rely on the presumption that the property was community. Plaintiff filed a cross-motion for summary judgment. The trial court ruled against plaintiff, denying her cross-motion for summary judgment, and rendered judgment in favor of defendants. In oral reasons for judgment, the trial court stated, "There has never been anything whatsoever done in these proceedings to put anyone on notice that Clarence did not own an undivided half interest of the community existing between him and Asia."
Plaintiff appealed. This court held in Harvey v. Amoco Production Company, 620 So.2d 401 (La.App. 1st Cir.), writ denied, 626 So.2d 1176 (La.1993) that Amoco could not rely solely on the rebuttable presumption that property acquired during this marriage belonged to the community of acquets and gains when the Act of Cash Sale clearly indicated otherwise. Thus, we reversed the trial court's granting of summary judgment and remanded the matter for further proceedings. Harvey, 620 So.2d at 404.
The case proceeded to trial before a civil jury on December 18, 19, 20, and 21, 1995. The jury rendered a verdict that the property was the separate property of plaintiff and therefore, Amoco was liable for royalty payments to plaintiff for the entire 1/10th interest. However, the jury found that plaintiff's claim had prescribed and that the doctrine of contra non valentem was not applicable. Since an action to recover underpayments or overpayments of royalties from the production of minerals is subject to a liberative prescription of three years under LSA-C.C. art. 3494, the trial court rendered judgment limiting plaintiff's recovery to payments, interest and costs for the three year period preceding the date her petition was filed, or from November 27, 1987. Plaintiff's claim for damages, attorney's fees, and dissolution of the August 20, 1977 lease between plaintiff and Amoco was denied.
Both plaintiff and defendant appealed from the judgment rendered in accordance with the jury verdict. Plaintiff assigns as error: (1) that the trial court erred in rejecting plaintiff's requested jury instruction on community property which incorporated certain language from this court's earlier opinion;[4] (2) that the trial court erred in rejecting plaintiff's requested jury charge on contra non valentem; (3) that the trial court erred in restricting the jury's inquiry into the facts supporting the doctrine of contra non valentem by limiting its inquiry to certain interrogatories; (4) that the trial court erred in failing to propound plaintiff's requested jury interrogatories on contra non valentem.
Defendant, Amoco Production Company, raises as error that (1) the jury was manifestly erroneous in finding that the 1/10 (one-tenth) interest in the property was plaintiff's separate property; and (2) in the event Amoco's exception of prescription is reversed, its judgment against the other defendants should be increased accordingly.[5]
Thus, these appeals present two questions to be resolved: first, was the property leased by plaintiff to Amoco community or separate; and second, if it was separate, has plaintiff's claim against Amoco prescribed or does the doctrine of contra non valentem apply? We *676 first address the issue of whether plaintiff's interest in the Port Hudson tract of land was community or separate under the law which applied at the time it was acquired.

WAS ASIA'S INTEREST IN THE PROPERTY COMMUNITY OR SEPARATE?
It is undisputed that Asia Jane Harris Harvey was married to Clarence Harris on August 28, 1943, and that they were divorced on September 12, 1961. Although Asia's petition for divorce alleged they were living together until February 25, 1954, this date was later disputed by plaintiff at trial.[6] Nonetheless, the acquisition of the Port Hudson tract of land, by cash sale on June 20, 1951, occurred while Asia and Clarence were still married to each other.
Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community under current LSA-C.C. art. 2340. Its predecessor article was LSA-C.C. art. 2405. Under jurisprudential interpretations of now repealed LSA-C.C. arts. 2334 and 2402, the presumption was deemed to be irrebuttable absent the so-called "double declaration."[7]Tullier v. Tullier, 464 So.2d 278, 281 (La.1985); Wood v. Wood, 424 So.2d 1143, 1145-1146 (La.App. 1st Cir.1982); Harvey v. Amoco, 620 So.2d at 404. This jurisprudentially established rule, requiring a declaration that immovable property was acquired with funds belonging to the husband separately and that it was being acquired for his individual estate, was eliminated by the 1979 amendment to LSA-C.C. art. 2340, which amendment has been held to be retroactive. Tullier, 464 So.2d at 281-282.
Generally, the party asserting the separate nature of the property in question has the burden of overcoming the presumption of community established in LSA-C.C. art. 2340. R.D.M. Corporation v. Patterson, 255 La. 301, 230 So.2d 820, 823 (1970); Albert v. Albert, 625 So.2d 765, 767 (La.App. 1st *677 Cir.1993). This burden is described as clear and convincing. Bernardi v. Chesson, 551 So.2d 678, 680 (La.App. 1st Cir.1989). The contradicted testimony of a litigant alone is insufficient to overcome the presumption of community. Reeves v. Reeves, 607 So.2d 626, 628 (La.App. 2nd Cir.), writ denied, 608 So.2d 1010 (La.1992).
We note first that a trial court's findings regarding the nature of property as community or separate are factual determinations which will not be disturbed absent manifest error. Dawson v. Dawson, 610 So.2d 917, 919 (La.App. 1st Cir.1992). Therefore, our standard of review of the verdict rendered by the jury in this case is whether the verdict was manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though an appellate court may feel that its own evaluations and inferences are as reasonable. Rosell, 549 So.2d at 844; Stobart v. State through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings. Rosell, 549 So.2d at 844.
Here, the "double declaration" contained in the Cash Act of Sale was not acknowledged by Clarence. Thus, even under the law in effect at the time of the acquisition, the presumption that the property was community was not rebutted conclusively by the mere presence of the "double declaration" and required further proof. See Albert, 625 So.2d at 767.
Bertha Wilkerson, Asia's sister, testified at trial that at the time of the sale in 1951, Asia "wasn't divorced but she didn't have a marriage." She stated that plaintiff's husband had left her while she was pregnant with her fourth child, Lionel, in March of 1951. Plaintiff's claim that she was living separate and apart from Harris, although not separated by judgment of court, prior to February 25, 1954, the date set forth in the divorce petition, is supported by the testimony of Gwendolyn Daniels. Gwendolyn Daniels testified that she was the daughter of Asia and John Harvey, Asia's second husband, and was born on February 9, 1953. Thus, although not determinative of the issues in this matter, it is apparent that plaintiff and Harris had ceased living together before the date alleged in the divorce petition.
Both Bertha and Annie Lee Richardson, another of Asia's sisters, testified that Annie Lee gave Asia the money to buy the property. Walton Barnes, II, an attorney with whom Asia consulted concerning her claim against Amoco, testified that a memorandum dated January 28, 1980, from him to his law clerks recited that Asia may have received the funds to purchase the property from her wages as a domestic, or as a result of contributions from the rest of the family.[8] Asia testified that her sister, Annie, gave her the money to buy the property and maintained that it was a gift "for me to get the place, for us to get the place." She testified she was not working at the time of the sale in June of 1951, noting that her son, Lionel Harris, was born on August 4, 1951.
The Assel defendants attempted to impeach Asia's testimony at trial with her deposition testimony taken on June 12, 1994. She testified at that time that she believed she and Clarence were still living together when Lionel was three years old. However, at trial Asia testified that when her deposition was taken, she had just been discharged from the hospital and was still sick, and "I just didn't know." At the time of trial, Asia was seventy-five years old.
Defendants' proof at trial consisted of the petition for divorce filed by Asia, asserting that she separated from Clarence on February 25, 1954; a mineral lease between Bertha Wilkerson and her husband, and Annie Lee Richardson and her husband, and Robert A. Davis, both dated February 26, 1979, in *678 which both husbands and wives signed;[9] the affidavit and testimony of W. Thomas Angers, an Amoco attorney and landman who signed an affidavit on July 24, 1978, which stated that he had met and spoken with Clarence Harris and that Harris had stated there was never any property settlement between Harris and Asia Jackson following or pending the divorce proceedings terminating their marriage; and the testimony of Walton Barnes, II that his contemporaneous notes of his interview with Asia indicated she may have earned the money to buy the property by working as a domestic.
It is apparent from the jury's verdict herein that the jury believed the straightforward and uncontradicted testimony of Asia and her two sisters that she bought the property with money provided by the rest of the family, and therefore that it was her separate property.[10] There was no testimonial or documentary evidence to directly contradict this testimony. Amoco contends that the jury erred in failing to find that the property was community based on the documents and testimony at trial, which it contends supports the inference that the property was community rather than separate. However, the direct testimony of the parties involved in the original sale in 1951, was that Clarence had nothing whatsoever to do with the sale, and that, in fact, he and Asia were no longer living together at the time she and her siblings acquired the property. Both Bertha and Annie testified that they talked with Asia almost daily during this period of time, and that they both were helping to take care of her and her three children after Clarence abandoned Asia.
After considering the record in its entirety, we believe that the evidence introduced by plaintiff was sufficient for a rational trier of fact to conclude that the presumption of community property was rebutted. Moreover, we find that Amoco failed to refute plaintiff's version of how the property was actually acquired. Thus, the jury's finding that the property was plaintiff's separate property is amply supported by the record and is not manifestly erroneous or clearly wrong.

DID THE TRIAL COURT ERRONEOUSLY LIMIT THE JURY'S INQUIRY REGARDING THE DOCTRINE OF CONTRA NON VALENTEM?

Plaintiff argues that under Corsey v. State, Through Department of Corrections, 375 So.2d 1319 (1979), there are four situations in which the running of liberative prescription is prevented by the application of the principle of contra non valentem. The fourth type of situation was described in Corsey as a jurisprudential rule that prescription will not run "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." Corsey, 375 So.2d at 1321-1322. Plaintiff's counsel argued at trial and on appeal that Asia, who sought counsel from numerous attorneys from 1979 until 1990, when she filed suit against Amoco, was not aware of her cause of action until 1990, and therefore prescription should not have run on her claim.[11] Specifically, plaintiff argues on appeal that the jury instruction given by the trial court on prescription and the jury interrogatories propounded were inadequate to address the issue of whether plaintiff had knowledge of her cause of action.
*679 The trial judge gave the following instruction to the jury:
The law provides that there's a period of time in which people have to come into court and seek redress. It's called prescription. You might have heard the word statute of limitations. You've only got so much time to come in and try to present your claim. We call it in Louisiana prescription. Ohio or up there, they call it a statute of limitations. It's what they call it where I come from in Oklahoma. Now, since you people are the judges of the facts and I the judge of the law, it's going to be necessary that a determination be made as to what the prescriptive laws are in this particular case, if applicable; and if so, what affect [sic] it might be. It's going to be necessary that I have certain facts to make a legal determination as to the prescriptive law. So these forms that I will give you will have some certain questions in them that you might think, well, why is that crazy fellow wanting us to answer these questions? Well, it has to do with giving me information so that I can use it to see whether or not the prescriptive law in Louisiana is applicable because the law provides that if reasonable notice is given and that there is no applicability of what we call contra non valentem, which means that a person really didn't know anything about the case or was ignorant of it, they were prohibited from doing it, didn't know they had a cause of action, under a certain set of facts a person could go all the way back to the very beginning of the lease. But if they had sufficient knowledge to put them on notice that they should do something, then the law limits that from three years from the filing of the suit to go back and I'll have to make that determination from the facts that you give. [sic].
The jury interrogatories propounded by the court asked the following questions concerning the issue of contra non valentem:
"5. Did Asia Harvey learn prior to 1980 that Clarence Harris had entered into a
 mineral lease on the subject property?"
 Yes 11-0 No _____
6. Did Asia Harris Harvey learn prior to 1980 that Clarence Harris was being paid
 money for the interest he claimed in the property?
 Yes 11-0 No _____
7. Did Asia Harris Harvey learn prior to 1980 that Clarence Harris was shown as
 having an interest in the property on Amoco's Division Order?
 Yes 11-0 No _____
8. Did Amoco take any action which prevented Asia Harris Harvey from asserting her
 claim against Amoco prior to September 18, 1990?
 Yes ___ No 11-0
9. When did Asia Harris Harvey learn that Amoco was paying Clarence Harris or his
 successors in title royalties on the property?
 Date: May 15, 1979"
Plaintiff proffered the following jury charges, which the trial court refused to give the jury:
REQUESTED JURY CHARGE # 3
The threshold question in this case is whether the property in controversy belonged to the community that existed between Asia Jane Harvey and Clarence Harris, or whether the property was her separate paraphernal property.

*680 Under the civil code and the attendant jurisprudence, the general rule is that all property acquired during marriage is presumed to belong to the community.
It has already been established and is the rule of law in this case that:
"... the Act of Cash Sale had a `double declaration' made by plaintiff, although not signed by Clarence Harris. The declaration placed the public on notice that this property was possibly plaintiff's separate property and that Clarence Harris may not own an undivided one-half interest in this property. Amoco and any successors in title could not solely rely on the rebuttable presumption that property acquired during this marriage belonged to the community of acquets and gains when the Act of Cash Sale clearly indicated otherwise." [Citations omitted.]
REQUESTED JURY CHARGE # 8
Under Louisiana Law, the Doctrine of "Contra Non Valentum" [sic] is recognized and prevents the running of prescription in four (4) situations. They are:
"(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; and (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action. A fourth situation where `contra non valentum' [sic] applies to prevent the running of prescription has been recognized in modern jurisprudence. This situation occurs where the cause of action is not known or reasonably knowable by the plaintiff, even though the plaintiff's ignorance is not induced by the defendant." [Citations omitted.]
Under Louisiana Law, the three-year prescriptive period does not begin to run on royalty miscalculation claims until the plaintiff could have known through the exercise of reasonable diligence that she had such a cause of action against Amoco.
"Constructive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong." [Citations omitted.]
"Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable." [Citations omitted.]
In addition to objecting to the trial court's refusal to give these requested charges, plaintiff also objected to the trial court's failure to include an interrogatory based upon requested jury charge number 8. Thus, these alleged errors by the trial court are properly before us for review.
The record indicates that Asia and her family members sought legal counsel from Walton Barnes, II, in mid-1979 and that they subsequently visited numerous attorneys in an attempt to recover royalty payments being made to Clarence Harris. Barnes and other attorneys she consulted all advised her that the property was in all probability classified as community, and she would have a very difficult burden of proof to overcome that presumption. Annie Lee Richardson and Bertha Wilkerson both testified that shortly after May 15, 1979, they were aware that Asia's checks for royalty payments were one-half of the amount they were receiving because payments were going to Clarence. Bertha also noted that Asia's interest was shown as 1/20th on the division order she received in 1979.
Despite this testimony, and other testimony and documentary evidence clearly indicating that Asia had prior knowledge that Clarence was receiving certain payments she felt should be made to her, she argues that her "cause of action" was not known to her.
A "cause of action" as used in the context of a peremptory exception is defined in Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234, 1238 (La.1993) as meaning the operative facts which give rise to the plaintiff's right to judicially assert the action against the defendant. Plaintiff argues that because lawyers advised her that *681 her claim would be difficult to prove, she believed she had no "cause of action."
This argument has no merit. As the jury verdict reflects, plaintiff was not prevented from asserting her claim by Amoco or by anyone else. She had knowledge of the facts upon which the claim would ultimately be based. She was not ignorant of her cause of action and there was no "legal cause" which prevented attorneys from taking cognizance of or acting upon her claim. Grant v. Carroll, 424 So.2d 389, 393 (La.App. 2nd Cir. 1982).
We find that the jury instructions on this issue, while less detailed than plaintiff desired, adequately explained the doctrine of contra non valentem, including an instruction regarding "knowledge of the cause of action" as set forth in Corsey. Moreover, the court's failure to propound plaintiff's proposed interrogatory as to whether, as a matter of fact, plaintiff knew or did not know that she had a cause of action is not erroneous. The jury's responses to the interrogatories which were propounded provided an adequate factual basis for the trial court to conclude that the doctrine of contra non valentem was not applicable.
The plaintiff's argument, that none of the interrogatories propounded to the jury were directed to the question of whether or not plaintiff knew or reasonably should have known that she had a cause of action against Amoco, is simply not supported by the record. Clearly, the jury found as a fact that plaintiff knew on May 15, 1979, that Clarence was being paid a 1/20th royalty interest under the lease on the contested property. Plaintiff's knowledge of that payment is tantamount to knowledge of her cause of action, especially considering the fact that plaintiff sought legal advice almost immediately upon learning about the payments to Clarence. Her decision not to assert a claim which she was advised would be difficult to prove does not compel the conclusion that she had no knowledge of her cause of action. It is clear from the record, and the jury so concluded, that she had more than the "mere apprehension... that `something was wrong,'" which has been held to be insufficient to start prescription. See Cordova v. Hartford Accident & Indemnity Company, 387 So.2d 574, 577 (La.1980).
Thus, these assignments of error are without merit.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Costs are assessed equally between plaintiff, Asia Jane Harvey, and defendants, Amoco Production Company.
AFFIRMED.
NOTES
[1] Judge Ralph E. Tyson is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Clarence Harris and Asia Jane Harris Harvey were divorced on September 12, 1961 in suit number 6805 in the Family Court of East Baton Rouge Parish. In plaintiff's petition for divorce, she alleged that no property was acquired during the marriage between her and her husband. The record indicates that this judgment was not recorded.
[3] Clarence Harris sold his mineral interest in the property to Robert Scott Davis by Act of Mineral Deed dated March 13, 1979. Davis and his wife, Marthalee Mannear Davis, sold their interest subsequently to Petrotrac, Inc., by Act of Mineral Deed dated April 7, 1986. Petrotrac, Inc., sold its interest to Edna J. Assel, Edna A. Carden, C.T. Carden, Joan A. Baldo, Edward F. Baldo, Jr., Allen J. Assel, and Sylvia W. Assel on April 8, 1986. The amended petition names Edna J. Assel, Edna A. Carden, C.T. Carden, Joan A. Baldo, Edward F. Baldo, Jr., Allen J. Assel, and Sylvia W. Assel as defendants.
[4] Although assigned as error, plaintiff did not separately brief the assignment of error concerning the trial court's failure to give her requested jury instruction which reiterated the holding in our earlier opinion in this matter. However, we find that plaintiff's brief adequately addresses this issue in its discussion of her other assignments of error.
[5] Amoco filed a cross-claim against the Assel defendants, asserting that it had paid royalties to them for a number of years under its mineral lease with Clarence Harris, and that in the event it was found that plaintiff was due part or all of the royalties she claimed, Amoco was entitled to recover against the Assel defendants under theories of warranty, payment of a thing not due, unjust enrichment, indemnification, and payment by error or mistake. The Assel defendants' exception of prescription was granted by the final judgment and Amoco's claim against them was dismissed.
[6] Because we find that plaintiff established that her interest in the property was acquired during the marriage with separate funds, through a donation made to her particularly, we need not determine whether or not plaintiff and Harris were actually living together at the time she acquired her interest in the property. See LSA-C.C. art. 2334 below.
[7] Former LSA-C.C. art. 2334 read, in part, as follows:

Separate property is that which either party brings into the marriage, or acquires during the marriage with separate funds, or by inheritance, or by donation made to him or her particularly.
The earnings of the wife when living separate and apart from her husband although not separated by judgment of court, her earnings when carrying on a business, trade, occupation or industry separate from her husband, actions for damages resulting from offenses and quasi offenses and the property purchased with all funds thus derived, are her separate property.
Actions for damages resulting from offenses and quasi offenses suffered by the husband, living separate and apart from his wife, by reason of fault on her part, sufficient for separation or divorce shall be his separate property.
Common property is that which is acquired by the husband and wife during marriage, in any manner different from that above declared. But when the title to community property stands in the name of the wife, it cannot be mortgaged or sold by the husband without her written authority or consent.
Where the title to immovable property stands in the names of both the husband and wife, it may not be leased, mortgaged or sold by the husband without the wife's written authority or consent where she has made a declaration by authentic act that her authority and consent are required for such lease, sale or mortgage and has filed such declaration in the mortgage and conveyance records of the parish in which the property is situated.
Former LSA-C.C. art. 2402 read:
This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. But damages resulting from personal injuries to the wife shall not form part of this community, but shall always be and remain the separate property of the wife and recoverable by herself alone; "provided where the injuries sustained by the wife result in her death, the right to recover damages shall be as now provided for by existing laws."
[8] The memorandum also notes that "[plaintiff] and her family are adamant that Clarence had absolutely nothing to do with the property."
[9] The earlier lease by Wilkerson and Richardson of the Port Hudson property with Amoco, dated August 20, 1977, was not signed by the husbands.
[10] We note that the only interrogatory propounded to the jury concerning whether the property was community or separate was phrased to ask the question in terms of the ultimate issue: "Do you find the property purchased by Asia Harris Harvey was: (a) Community Property___ (b) Separate Property___ (If community property, go no further. If separate property, continue the questions.)"
[11] LSA-C.C. art. 3494(5) is applicable to plaintiff's claim against defendants:

The following actions are subject to a liberative prescription of three years:
* * * * * *
(5) An action to recover underpayments or overpayments of royalties from the production of minerals, provided that nothing herein applies to any payments, rent, or royalties derived from state-owned properties.