698 So.2d 730 (1997)
Joseph C. KAVANAUGH, et ux., Plaintiffs-Appellants,
v.
Warren LONG, M.D., Defendant-Appellee.
No. 29380-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1997.
*732 Nelson, Hammons & Self by John L. Hammons, Shreveport, for Plaintiffs-Appellants.
Blanchard, Walker, O'Quin & Roberts by Lawrence C. Pettiette, Jr., Joseph S. Woodley, Shreveport, for Defendant-Appellee.
Before NORRIS, BROWN and STEWART, JJ.
NORRIS, Judge.
The plaintiff, Joseph Kavanaugh, appeals a judgment based on a jury verdict that dismissed his medical malpractice and intentional tort claims against Dr. Warren Long. For the reasons expressed, we affirm.

Factual synopsis
Kavanaugh sustained an on-the-job neck injury in March 1983.[1] This resulted in pain in his neck and pain radiating down his left arm. His treating physician, Dr. Thomas Edwards, admitted him to Bossier Medical Center and secured the defendant, Dr. Long, for consultation. Dr. Long performed a myelogram which showed a "large defect at C5-6 on the left"; he diagnosed a ruptured disk and recommended a diskectomy with a fusion of the C5 and C6 vertebrae. Kavanaugh eventually scheduled this surgery for April 19, 1983, to be performed by Dr. Long at Bossier Medical Center.
Prior to surgery, Dr. Long wrote a progress note stating that he was admitting the patient for a C-HNP (cervical herniated nucleus pulposus) at C5-6, and Kavanaugh testified that he understood he was to have an operation at that level. The admission summary sheet also shows that the procedure was to be performed at C5-6.
Dr. Long later admitted, however, that the marker needle was inadvertently placed in Kavanaugh's C6-7 interspace (as noted in a pre-operative X-ray interpreted by radiologist Dr. Bruce Brian); he removed that disk instead of C5-6, and fused the C6 and C7 vertebrae. On the date of surgery he dictated the following records: an admit history referring to a soft disk at C6-7; a physical report referring to an anterior cervical fusion and diskectomy at C6-7 (also mentioning a problem at C5); and an operative report listing the diagnosis of a disk at C6-7 and describing the procedure he utilized to remove that disk and fuse the vertebrae. Dr. Long sent a specimen identified as "herniated disk C6-C7" to pathology and wrote an operative progress note stating that he performed an ACF (anterior cervical fusion) at C6-7. Post-operative X-rays by Dr. Brian and Dr. B.R. Siebenlist confirmed that the disk removed was C6-7. Dr. Long admitted that his office received these radiology reports, as well as the operative report, within a week, but he did not advise Kavanaugh, either in the hospital or at any subsequent time, that he had operated on the wrong disk.
Dr. Long dictated his discharge summary on June 4. He testified that on that date, he finally reviewed and signed his prior reports that were included in Kavanaugh's hospital chart and altered several (the history, progress reports, and portions of the operative report) to read "C5-6," the intended surgical site, instead of "C6-7," the actual site. He also altered Dr. Brian's X-ray report of April 19, without that doctor's consent. Dr. Long testified that he thought he was correcting these records to reflect the actual site. However, he did not correct the physical report, the anesthesia record or the nurses' notes; these still accurately reported that the operation *733 was at C6-7. The discharge summary, dictated after he had reviewed these records and altered some of them, erroneously states the operation was at C5-6.
At his first two post-operative office visits, Kavanaugh reported relief from his arm pain, but lingering paresthesia in his left thumb; on his final post-op visit in late August, he complained of neck pain.[2] Because he was dissatisfied with Dr. Long, Kavanaugh skipped a September post-op visit and never returned. Dr. Long's office records include a notation that the office phoned him on September 23, 1983, but this was not really corroborated.[3] Kavanaugh's last documented communication with Dr. Long's office is a May 1984 letter requesting a worker compensation form.[4] Dr. Long subsequently maintained he was unaware that he had operated at the wrong level until he gave a deposition in 1991.
Kavanaugh went back to his original treating physician, Dr. Edwards, in July 1984, over a year after surgery. At this time he was still having neck and shoulder pain, the same complaints as before surgery; nevertheless, he had resumed his work as a heating and air contractor at Barksdale AFB. Dr. Edwards ordered a "cervical series" and, later, a CT scan, neither of which showed any evidence of a fusion at C5-6; he advised Kavanaugh on July 20, 1984, that apparently the fusion had been "absorbed." In spite of X-rays and the CT scan inconsistent with the history of a fusion, Dr. Edwards maintained he did not contact Dr. Long or review the hospital records.[5]
Because of continued symptoms, Dr. Edwards referred Kavanaugh to Dr. Donald Ray Smith in September 1984. Dr. Smith testified that at the time, the patient gave him a history of surgery at C6-7, and that he discussed this fact with Kavanaugh; however, Dr. Smith's contemporaneous notes do not refer to any particular level. Dr. Smith's September 18 letter to Dr. Edwards stated, based on the patient's comments and review of Dr. Edwards's July 1984 X-ray, that the surgery was probably at C6-7, but there were still osteophytes at the C5-6 level. Kavanaugh testified that in the September 1984 visit, Dr. Smith discussed the problems at C5-6, where Kavanaugh always thought his problems were, and that the doctor's dictation referring to C6-7 was wrong.
Kavanaugh continued to work but his condition gradually deteriorated. For several years he treated regularly with Dr. Edwards, who ordered an MRI in late August 1989. Kavanaugh returned to Dr. Smith on September 8, 1989. Dr. Smith testified that he reviewed the MRI and report and discussed the findings fully with the patient. He testified that advised Kavanaugh that he definitely had a fusion at C6-7, that he could not discern any evidence of a fusion at C5-6, and that there were osteophytes at C5-6 which could be remedied by fusion. Dr. Smith essentially corroborated this in a letter to Kavanaugh's employer, in which he recommended an anterior cervical diskectomy and fusion. In November 1989 Dr. Edwards declared Kavanaugh totally disabled, and he has not worked since then.
*734 Kavanaugh testified that after he left his job, the Office of Workers' Compensation wanted the test results and reports regarding his disability. He testified that he went to Dr. Edwards's office and collected his file on November 30, 1989, intending to deliver it the next day. That evening, however, he opened the file and read the August 1989 MRI radiology report, which found "solid bony fusion at C6-7, disk herniation at C5-6." He testified that only then did he realize that he had received a fusion at C6-7 in 1983, and still had a herniated disk at C5-6.

Procedural history
Kavanaugh filed his petition for a Medical Review Panel in Bossier Parish on October 22, 1990.[6] Dr. Long urged that the request came over three years after the alleged malpractice occurred and was therefore barred by La. R.S. 9:5628. The Bossier Parish District Court, however, overruled the exception, citing evidence that Dr. Long concealed his error from the patient as sufficient to invoke the doctrine of contra non valentem.[7] The MRP decided in February 1993 that Dr. Long breached the appropriate standard of care by failing to assure that he operated on the right level and by not advising Kavanaugh that the operation was wrong. The MRP could not decide, however, whether Kavanaugh was disabled or permanently impaired as a result of Dr. Long's conduct.
The instant suit against Dr. Long followed in April 1993. The petition alleged both malpractice (operating at the wrong level, failing to detect the error, failing to treat the ruptured disk at C5-6) and intentional tort (altering medical records, concealing the error from the patient, misleading the patient as to his condition). Joseph Kavanaugh claimed damages for pain and suffering, mental distress, residual and permanent injury and disability, loss of income and earning capacity, and past and future medicals. Dorothy Kavanaugh claimed damages for loss of consortium, loss of support, and interference and impairment of the marital relationship. Dr. Long requested a jury trial on all issues.
The matter was tried over five days in November 1994. In opening remarks counsel conceded, and in testimony Dr. Long admitted, that he breached the standard of care by operating at the wrong level; however, they steadfastly denied concealment. During trial, the plaintiffs filed a motion for directed verdict on the issue of liability, an exception of res judicata, and motions to enforce and make executory the Bossier Parish judgment that overruled the exception of prescription.[8] The District Court denied these motions except to say that the prior ruling on the exception was "recognized in accordance with the law." The District Court also ruled that the "fact sensitive issue of prescription and contra non valentem "should go to the jury.
In response to special interrogatories, the jury found:
(1) Do you find that Dr. Long knew that he operated at the wrong level and intentionally kept that information from Joseph Kavanaugh? No.

(1A) Do you find that Joseph Kavanaugh brought this action within one year from the date he knew or should have reasonably known that Dr. Long performed surgery at the wrong level? No. * * *
(6, 7)Do you find that Dr. Long committed an intentional act that caused damage to Joseph Kavanaugh? No. * * *[9]
The District Court rendered judgment in accord with these interrogatories, dismissing the malpractice claim as prescribed, and dismissing the intentional tort claim on its merits. The plaintiffs' motion for JNOV or a new trial was denied with written reasons.

*735 Discussion: Trial of peremptory exception

By his eleventh and twelfth assignments of error Kavanaugh urges the District Court erred in permitting the jury to decide Dr. Long's exception of prescription.[10] He contends that matters raised by the exception are not part of the merits of the case and thus must be resolved by the court alone, not the jury; in support he cites Elzy v. ABC Ins. Co., 472 So.2d 205 (La.App. 4th Cir.), writ denied 475 So.2d 361 (1985). He adds that the court does not invade the province of the jury by making a factual determination on the trial of the exception. McGehee v. Brown, 3 La. Ann. 272 (1848). Dr. Long argues that when the facts raised by the plaintiff's case in chief and by the defendant's exception are identical, those facts can be decided by the jury. Anderson v. Collins, 26,142 (La.App.2d Cir. 1/6/95), 648 So.2d 1371, writs denied 95-0629, 95-0783 (La.4/21/95), 653 So.2d 576.
If the peremptory exception has been pleaded in the answer, or subsequently, but at or prior to the trial of the case, it shall be tried and disposed of either in advance of or on the trial of the case. La. C.C.P. art. 929 B. In such a case the district court has discretion to refer the exception of prescription to the merits. American Bank v. Saxena, 553 So.2d 836, 842 (La.1989); Knighten v. Knighten, 447 So.2d 534 (La.App. 2d Cir. 1984). By contrast, if the exception is pleaded before the answer, it must be tried in advance of the trial of the case. La. C.C.P. art. 929 A; Babineaux v. Pernie-Bailey Drilling Co., 261 La. 1080, 262 So.2d 328 (1972); Martinez v. Breaux Mart Inc., 93-2257 (La.App. 4th Cir. 1/13/94), 631 So.2d 471; but see Short v. Griffin, 95-0680 (La.6/16/95), 656 So.2d 635.
Dr. Long raised prescription as an affirmative defense in his answer to the instant petition. The case is therefore distinguished from Elzy v. ABC Ins. Co., supra, as that opinion states that the exception was filed prior to answer.
The recent case of Short v. Griffin, supra, was a claim for accountant malpractice, to which all defendants filed exceptions of prescription, some prior to and others after their answers. The district court referred all the exceptions to the merits. On supervisory writs, the court of appeal ruled that those exceptions filed prior to answer could not be referred to the merits. On review, the Supreme Court held that the district court has the discretion to refer to the merits even those exceptions of prescription filed prior to the answer. Describing the trial court's discretion as "long-recognized," the court stated, "`the evidence on prescription is so intertwined with the evidence of the merits' that it would be a waste of judicial economy to try the two matters in separate proceedings."[11]
This reasoning applies a fortiori in the instant situation, when the contested exception was raised in the answer. In fact, the rationale of Short v. Griffin is essentially the same as this court applied in Anderson v. Collins, supra, when we reversed a trial judge's decision to withhold a peremptory exception of res judicata from the jury. We stated:
These allegations formed part of the plaintiff's case against the defendant attorneys for malpractice and wrongdoing. The factual proof necessary to sustain these allegations substantially overlapped the proof which plaintiffs would have to have made as a defense to the exception of res judicata. Thus, the question is raised whether these factual issues should have been placed before the jury on the merits, or before the judge pursuant to the "motion in limine." Under these circumstances, *736 and considering the well established principle that the right to a jury trial is fundamental and favored, we hold that the trial court erred in taking these factual issues away from the jury and deciding them in advance of trial[.] 26,142 at p. 13, 648 So.2d at 1381.
In the instant case the District Court ruled that the "fact sensitive issue of prescription and contra non valentem" should go to the jury. This is consistent with the Supreme Court's analysis in Short v. Griffin, supra, and this court's analysis in Anderson v. Collins, supra, and is not an abuse of discretion. The factual issues of concealment and discovery are closely intertwined and completely overlap the issue of prescription. We perceive no abuse of discretion in the District Court's action. These assignments lack merit.

Application of contra non valentem
By his first assignment Kavanaugh urges the district court and the jury erred in failing to conclude that contra non valentem should apply to Dr. Long's exception of prescription. We note, however, that the court substantially instructed the jury that contra non valentem applies:
[A]n exception may exist to the time limitations if the defendant has intentionally concealed an act of malpractice. In considering whether the defendant intentionally concealed malpractice, you may consider such factors as: fraud, misrepresentation, breach of duty to disclose or ill practice.
In medical malpractice cases which are filed more than three years from the date of the alleged malpractice, the plaintiff bears the burden of proving that the case has not been filed too late. The plaintiff can only prove that the case has not been filed too late if he proves that the physician intentionally concealed the facts necessary for plaintiff to recognize that he may have a medical problem related to Dr. Long's treatment.
R.p. 152.
The jury verdict form tracks these instructions. Although we find the court properly charged the jury, we note that the law in this area is not entirely settled.
The statute creating time limits for medical malpractice actions is La. R.S. 9:5628, and it provides in pertinent part:
A. No action for damages for injury or death against any physician * * * whether based upon tort, breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at latest within a period of three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
Despite statutory time limits, the jurisprudence has held that prescription does not run against a person who is unable to act ("contra non valentem agere nulla currit praescriptio"). The doctrine interrupts or suspends prescription in four general situations:
(1) Some legal cause prevents the courts or their officers from taking cognizance of the plaintiff's action;
(2) Some condition coupled with the contract or connected with the proceedings prevented the creditor from suing;
(3) The debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
(4) The cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
Corsey v. State, 375 So.2d 1319 (La.1979); Whitnell v. Menville, 540 So.2d 304 (La. 1989). Notably, R.S. 9:5628 expressly prohibits the application of the fourth category of contra non valentem to medical malpractice cases. Whitnell v. Menville, supra.
In Rajnowski v. St. Patrick's Hosp., 564 So.2d 671 (La.1990), a plurality declined to *737 apply the third category of contra non valentem to a malpractice case because it found the defendant doctor's failure to disclose test results did not constitute material misrepresentation. The concurring justice stated that even if the test results were material information and the doctor's action prevented the plaintiff from timely filing suit, the doctrine of contra non valentem could not be invoked because the doctor did not intentionally conceal the information. In short, the majority did not find the necessary factual background to justify an application of the third category of contra non valentem.
The Supreme Court recently reiterated this in Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96), 674 So.2d 960, by stating:
Heretofore, this court has failed to expressly and directly declare that the third category of contra non valentem applies to medical malpractice cases. * * * The court has nevertheless examined the applicability of the third category to facts in medical malpractice cases. * * * Assuming that the third category of contra non valentem does apply to medical malpractice actions under La. R.S. 9:5628, the court will determine whether its application has been triggered under the facts and circumstances of the present case.
95-1707, at p. 5; 674 So.2d at 963 (citations omitted).
The court in Fontenot proceeded to find that the doctor's conduct (telling the plaintiff that the numbness in her leg would resolve by itself) did not amount to concealment. The Supreme Court has never actually applied the third category of contra non valentem to suspend or interrupt R.S. 9:5628 prescription because it has never found facts to support a finding that the defendant concealed material information from the patient. See also Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23.[12]
While the Supreme Court has "assumed" that the third category would apply to concealment cases, this does not mean that prescription is suspended indefinitely. The statute still requires that petition be filed within one year from the discovery of the malpractice or concealment. Dissenting from the denial of a remand in Whitnell v. Silverman, supra, Justice Lemmon explained the relationship between concealment and discovery:
The doctrine of contra non valentem is based on the principle that prescription does not run against a party who is unable to act. The doctrine prevents the commencement or the running of liberative prescription under certain circumstances. While the fourth category of contra non valentem focuses on the reasonableness of the creditor's inaction, * * * the third category focuses on the conduct of the debtor that effectually prevents the creditor from asserting a cause of action timely. There is a vast difference between the situation in which a doctor negligently fails to learn material information about the patient's condition and the situation in which the doctor knows material information and breaches his or her duty to disclose the information to the patient. In the former situation, the doctor commits a single breach of duty to diagnose correctly the patient's condition which is known neither by the doctor nor the patient, and the fourth category of contra non valentem would apply but for R.S. 9:5628. In the latter situation, the doctor, who is in a fiduciary relationship with the plaintiff, has a continuing duty to disclose the known material information, not only on the day that the doctor learns the information, but also on every day thereafter until the patient learns the information from another source. Breach of this continuing duty is analogous to a continuing tort, and a new cause of action (with a new prescriptive or peremptive period) arises each day that the doctor fails to disclose, either intentionally or negligently, the material information known by the doctor but not by the patient, and therefore effectually prevents the patient from availing himself or herself of the cause of action.

*738 95-0112, dissent at p. 5-6, 686 So.2d at 34 (emphasis added).[13]
Thus in a medical malpractice case in which the health care provider intentionally conceals or withholds material information with which the patient could learn of the malpractice, the third category of contra non valentem applies to suspend the three-year prescriptive period of R.S. 9:5628, but only until the patient knew or should have known of the malpractice or concealment from other sources; at that point, the one-year prescriptive period of R.S. 9:5628 applies. The one-year period is the same as that imposed on all tort victims under La. C.C. art. 3492; cf. Taylor v. Giddens, 92-3054 (La.5/24/93), 618 So.2d 834.
The one-year prescriptive period begins to run when the patient discovers, or should have discovered, the facts upon which the cause of action is based. In re Medical Review Panel of Howard, 573 So.2d 472 (La. 1991). Constructive knowledge sufficient to begin the running of prescription requires more than a mere apprehension that something might be wrong, but "a reasonable basis for filing suit against a certain defendant" is sufficient. Fontenot v. ABC Ins. Co., supra. In other words, the simple knowledge that "an undesirable condition has developed at some time after the medical treatment" does not equate to knowledge of everything to which inquiry may lead. Griffin v. Kinberger, 507 So.2d 821 (La.1987); Harlan v. Roberts, 565 So.2d 482 (La.App. 2d Cir.), writ denied 567 So.2d 1126 (1990). The issue is the reasonableness of the patient's action or inaction, in light of his education and intelligence, severity of symptoms, and the nature of the defendant's conduct. See Griffin v. Kinberger, supra; Harlan v. Roberts, supra; Lambert v. Metrailer, 485 So.2d 69 (La.App. 1st Cir.), writ denied 488 So.2d 1023 (1986).

Manifest error
By his second assignment of error Kavanaugh urges the jury was plainly wrong to conclude that Dr. Long did not know that he operated at the wrong level and did not intentionally keep this information from the plaintiff. Because the case is ultimately resolved on the question of whether Kavanaugh filed his claim within one year of when he knew or should have known of the malpractice or concealment, we will assume that Dr. Long concealed material information from the plaintiff.[14]
By his third assignment of error, Kavanaugh urges the jury was plainly wrong to find that he failed to bring his action within one year from the date that he knew or should have known that Dr. Long operated at the wrong level. He contends that he did not know until November 30, 1989, when he read the radiology report of his August 1989 MRI, that Dr. Long had operated on C6-7 instead of C5-6, and that his petition for a Medical Review Panel, filed on October 22, 1990, was timely. Dr. Long argues that there is sufficient record evidence to support the jury's finding that Kavanaugh had actual or constructive knowledge of the erroneous surgery far more than one year prior to petition.
An appellate court may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The Supreme Court has stated a two-tier test for reversal on appeal. First, the appellate court must find from the record that a reasonable *739 factual basis does not exist for the finding of the trial court and, second, the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120 (La.1987); Lewis v. State, 94-2370 (La.4/21/95), 654 So.2d 311. Mere disagreement with the fact finder's finding is not, by itself, ground for the appellate court to substitute its own judgment for that of the trial court. Lewis v. State, supra. Reversal is warranted only when the record in its entirety shows that the verdict is clearly wrong. Stobart v. State, supra.
Where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not believe it, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell v. ESCO, supra. However, the fact finder's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal where conflict exists in the testimony. Stobart v. State, supra. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Lewis v. State, supra.
We have closely examined the record for the evidence regarding Kavanaugh's actual or constructive knowledge that surgery was performed at the wrong level. He steadfastly and resolutely maintained that prior to surgery in April 1983 he knew his neck problem was at C5-6 and that he would have surgery there. See, e.g., R.pp. 581-582. He also testified that during his hospital stay, Dr. Long advised him the operation had been at C5-6. R.p. 583. He generally testified that after his hospital stay, he believed the operation had been at C5-6 and that Dr. Long never informed him otherwise. R.pp. 584-585. He also testified that Dr. Edwards told him the C5-6 fusion had been "absorbed." However, he admitted that Dr. Edwards's letter of May 17, 1983 Department of Labor ("work-up revealed a herniated C6-7 disk which was removed by Dr. Warren Long") shows that a copy was sent to him. R.p. 607.
Moreover, despite Kavanaugh's claim that Dr. Long did not advise him of any possible error, the following colloquy occurred on direct examination:
Q. The jury has seen this before [Dr. Long's office notes, listing the diagnosis of "soft disk defect, C6-7"]. I'm going to just ask you, did Dr. Long ever tell you when you were in his office on May 20, 1983, on June 14, 1983, or on August 25, 1983, that his diagnosis was soft disk defect, C6-7 limit?
A. Yes.

Q. He told you that's what it was. What did he tell you?
A. He told me that hewhen I went back he told me that his had operated on it. I believe he said C-6, C-7. I'm not for sure. That's been a long time ago but we did discuss it. I had a lot of complaints and everything and the last time we was back we got into an argument about my condition.
R.p. 592 (emphasis added).
The specter of Kavanaugh's actual or constructive knowledge of the surgical error rises higher with his visit to Dr. Smith in September 1984. Dr. Smith wrote a letter to Dr. Edwards on September 18 stating that "the patient thinks that his surgical level was C6-7," and he testified at trial that this was what Kavanaugh reported to him. R.p. 780. Dr. Smith also testified that he discussed his findings with the plaintiff:
I discussed basically the things that we have already reviewed. I discussed the fact that it appeared to me that surgery had taken place at C6-7. This was what Mr. Kavanaugh had told me also to be his impression. But that was my impression not only from what he told me but from the appearance of the X-rays.
I also told him that I thought there were problems at C5-6, and that I thought probably that all of this is inexact; sometimes it's difficult to determine clinically the difference between a nerve root at C6 and a nerve root at C7 that may be producing *740 problems. But on the basis of the indications that I've already indicated and the location of the problems and the findings on the X-ray, I felt it most likely that his symptoms were coming from the impingement at C5 and C6
R.p. 785-786.
Kavanaugh testified that Dr. Smith's dictation was wrong, that he told Dr. Smith his problems were at C5-6, and that the doctor did not advise him of any possible error. R.p. 612.
Perhaps the most impressive evidence of Kavanaugh's knowledge is the September 8, 1989 visit to Dr. Smith. The doctor testified that on that occasion he reviewed the film and report from the August 1989 MRI, which Kavanaugh had likely carried to him. R.pp. 822-823. He described on cross examination his findings and his conversation with the patient:
Q. Well, after Mr. Kavanaugh came to see you and you saw this report, which clearly shows fusion at C6-C7, did you tell him Dr. Long did surgery at the wrong level?
A. I never used the words "wrong level" to Mr. Kavanaugh; however, we discussed this study in great detail being as plain as I could that he definitely had had surgery at C6-7. I couldn't tell whether he had surgery at C5-C6 or not but there was a large defect at C5-C6 which had been present before, and that I thought C6-C7 looked fine; that I did not think there was any pain on the basis of C6-C7; that I thought the current pain of which he was complaining in 1989 was on the basis of C5-C6.
R.p. 818 (emphasis added).
On redirect Dr. Smith again emphasized that he had tried to impress on Kavanaugh that his medical condition was a good fusion at C6-7, and a problem at C5-6. R.p. 826. His letter of September 8 does not refer to the earlier fusion, only to the MRI report showing osteophytes at C5-6. Kavanaugh testified, regarding this office visit, "I knew something was wrong somewhere or another." R.p. 616.
Kavanaugh admitted that on November 30, 1989, he opened his file and read the MRI report which clearly disclosed that surgery had been at C6-7. R.pp. 600-601. He argues that when he "read the report, he immediately knew what two neurosurgeons and one orthopedic surgeon had withheld from him, i.e., that Dr. Long had performed the fusion at the wrong level and failed to surgically address Mr. Kavanaugh's herniated disk at C5-6." Br., 7. This realization arose from reading the exact same film and report which Dr. Smith testified that he reviewed and discussed "in great detail" with Kavanaugh on September 8, and which Kavanaugh may have carried to his office.
We are constrained to hold that this evidence is a classic case of conflicting testimony. Kavanaugh generally denied that Dr. Long, or any other doctor, told him that the operation had been at C6-7, and he always believed it had been at C5-6; however, he did state at the beginning of his direct examination that on August 25, 1983, "I believe he [Dr. Long] said C-6, C-7." This testimony may have impacted the plaintiff's credibility in the jury's mind. Dr. Smith and the plaintiff gave conflicting accounts of the September 1984 office visit; Dr. Smith's account, however, is corroborated by his letter to Dr. Edwards written the same day as the examination. If the jury accepted the doctor's testimony that Kavanaugh related a history of a C6-7 operation, then this would be sufficient to charge Kavanaugh with knowing at that time that his surgery was not where he clearly understood it was supposed to be. See Fontenot v. ABC Ins. Co., 95-1707, at p. 8, 674 So.2d at 964. Dr. Smith is emphatic that he advised Kavanaugh in September 1989 that the surgery had been at C6-7, the fusion was present at that level, and there were still problems at the original site, C5-6; although this testimony is not entirely corroborated by his September 8 letter to the Department of Labor, it is not inconsistent with the letter.
In short, this is a case of conflicting testimony which can only be resolved by an assessment of the witnesses' credibility. The jury obviously rejected the plaintiff's contention that he was unaware of the error until *741 November 30, 1989, and accepted the record evidence that he knew or reasonably should have known of it in September 1984 or September 1989, over a year before the instant petition for MRP was filed in October 1990. We are unable to find in Dr. Smith's testimony any internal inconsistencies or the kind of variance from the documentary and objective evidence that would make it unacceptable to a reasonable fact finder. Rosell v. ESCO, supra. The jury made a credibility call which is reasonably based on the evidence and we are powerless to disturb. Stobart v. State, supra. We are unable to declare that their finding is plainly wrong or manifestly erroneous. This assignment of error lacks merit.
At the same time that he knew or should have known of the malpractice, Kavanaugh also knew or should have known, on the facts presented, that Dr. Long had intentionally withheld information from him; Dr. Long never admitted, until 1991, that he operated on the wrong level. Kavanaugh had one year from the date he knew or should have known of the malpractice or concealment to bring his action "whether based upon tort, breach of contract, or otherwise." La. R.S. 9:5628 A. The intentional tort claim is therefore prescribed, although the judgment dismissed it "on the merits." Appeal lies from the judgment itself, not the reasons therefor. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2d Cir.1987). The judgment is not plainly wrong, even though the reasons are perhaps inaccurate. The judgment will be affirmed in its entirety, to dismiss both the malpractice and the intentional tort claims.

Conclusion
Kavanaugh's remaining assignments of error address the District Court's failure to grant his motion for JNOV or new trial, the issue of quantum, and the rejection of Mrs. Kavanaugh's claims for damages. Because we conclude that all claims have prescribed, we find no error in the denial of JNOV or new trial, and we pretermit all consideration of damages.
For the reasons expressed, the judgment dismissing all the plaintiffs' claims is AFFIRMED. Costs are assessed to the appellants, Joseph C. Kavanaugh and Dorothy Kavanaugh.
AFFIRMED.
STEWART, J., dissents and assigns written reasons.
STEWART, Judge, dissenting.
Because I disagree with the majority's analysis on the issue of prescription and contra non valentem, I respectfully dissent.
Considering pertinent authority, I find that the trial judge erred as a matter of law by allowing the jury to decide the issue of prescription. The majority opinion distinguishes Elzy v. ABC Ins. Co., 472 So.2d 205 (La.App. 4 Cir.1985), as the exception at issue in Elzy was filed prior to answer whereas Dr. Long pleaded the exception of prescription in his answer. However, the court of appeal clearly rejected the argument that disputed facts relating to an exception of prescription can only be decided by a jury, as follows:
One entitled to jury trial is entitled only to have the facts relative to the merits of the case decided by a jury, and matters raised by exception are not part of the merits. One whose claim has prescribed in not entitled to have a trial on the merits of the case, not by jury and not by judge. One is not entitled to have the jury decide a fact-based exception, just as one is not entitled to have the jury decide a fact-based exception to the jurisdiction of the court. McGehee v. Brown, 3 La.Ann. 272 (1848). The judge does not invade the province of the jury by making factual determinations on the trial of exceptions.
Elzy v. ABC Ins. Co., 472 So.2d at 207. The Louisiana Supreme Court's holding in McGehee v. Brown, supra, that a plaintiff cannot require that an exception be submitted to the jury has not been overruled, criticized, distinguished, limited or questioned by any subsequent cases.
Although reaching a different conclusion in Anderson v. Collins, 26,142 (La.App. 2 Cir. 1/6/95), 648 So.2d 1371, this court noted that, ordinarily, a judge does not invade the province of a jury by making factual determinations *742 on the trial of exceptions. However, this court held that, under the very unique circumstances presented by Anderson, the general rule does not apply. The morning a jury trial was to begin, defendants filed a motion in limine seeking recognition of a summary judgment rendered by an Arkansas court. Finding that the trial court erred in taking factual issues presented by a "motion in limine" away from the jury, this court determined that the motion in limine was in the nature of an exception of res judicata and that the factual proof necessary to sustain the allegations of the petition overlapped the proof which plaintiffs would have to show as a defense to an exception of res judicata. Plaintiffs' allegations of fraud and ill practices with respect to the procuring of the Arkansas summary judgment formed a part of plaintiffs' case against defendant attorneys for malpractice and wrongdoing.
In a more recent case, the Louisiana Supreme Court interpreted La. C.C.P. articles 929 and 1001 together to mean that a peremptory exception pleaded before answer must be scheduled for trial in advance of trial on the merits, but that the judge's options in deciding the trial of the exception include referring the exception to the merits in appropriate cases. When the evidence on prescription is so intertwined with the evidence of the merits, the trial court is not required to try an exception on merits prior to trial on merits as it would be a waste of judicial economy. Short v. Griffin, 95-0680 (La.6/16/95), 656 So.2d 635. In that case, the trial court referred the exceptions to the merits, noting that the evidence to be presented at the anticipated three-day trial of the exceptions would have to be repeated at the trial on the merits. The opinion did not mention whether that case was to be tried by a jury. Even were the matter to be tried by a jury, the trial court retains the power and duty to rule on questions of law, including exceptions. Although finding that referral of the exception to the merits was proper, the Louisiana Supreme Court did not hold that an exception should be decided by the jury.
In the instant case, the trial judge ruled that the "fact sensitive issue of prescription and contra non valentem" should go to the jury. Although the trial judge's decision appears to be consistent with this court's analysis in Anderson, that case was decided on unique and complex facts and should not be read to supplant the general rule, as stated in that case and in McGehee v. Brown, supra, and Elzy v. ABC Ins. Co., supra, that a party "is not entitled to have the jury decide facts bearing on an exception." Anderson v. Collins, 648 So.2d at 1381. The trial judge erred as a matter of law by allowing the issue of prescription and contra non valentem to be decided by the jury.
The manifest error standard is not applicable where legal errors taint the fact-finding process. Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La.2/20/95), 650 So.2d 742. Generally, if the record is otherwise complete, an appellate court should, if it can, render judgment on the record where the trial court has made an erroneous ruling. Gonzales v. Xerox, 320 So.2d 163 (La.1975). However, when the weight of the evidence is so roughly equal that "a first-hand view of the witnesses is essential to a fair resolution of the issues," the case should be remanded for new trial. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). See also Jones v. Black, 95-2530 (La.6/28/96), 676 So.2d 1067.
Upon review of the entire record, including the voluminous transcript, the testimony on the issues of prescription and contra non valentem is so close that a view of the witnesses is necessary to resolve the conflicting evidence. For that reason, I would remand this matter for new trial.
NOTES
[1] Kavanaugh also sustained a work-related injury to his lower back and shoulders in 1981; he treated with Dr. Edwards fairly continuously for this injury until the instant accident on March 4, 1983.
[2] For each of these post-op office visits, Dr. Long's office reports state that the diagnosis was a soft disk defect at C6-7 left.
[3] Dr. Long's office manager, Mrs. Bailey, wrote the note stating that she phoned Kavanaugh on September 23, 1983 to advise that he needed additional surgery which Dr. Long would provide at no cost. She testified, however, that if she phoned a patient she had authority only to ask him to come to the office and, perhaps, to take a second myelogram. Kavanaugh denied receiving any call from Mrs. Bailey.
[4] Kavanaugh testified that Dr. Long phoned him sometime after July 20, 1984, to say that after a chance meeting with Dr. Edwards at Bossier Medical Center, he (Dr. Long) believed that Kavanaugh had apparently "absorbed a fusion" and needed surgery; and that a new operation was necessary. Both Dr. Long and Dr. Edwards denied this incident.
[5] Dr. Edwards never advised Kavanaugh that the surgery may have been performed at the wrong level, claiming he himself was unaware of this until after an MRI was performed five years later. The instant record, however, includes a letter from Dr. Edwards to the U.S. Department of Labor dated May 17, 1983, in which he states that Dr. Long removed a herniated C6-7 disk. Ex. P-4, p. 67. Kavanaugh has a separate action pending against Dr. Edwards.
[6] This is the date of certified mailing of the petition for MRP. See La. R.S. 40:1299.47 A(2)(b).
[7] This court denied Dr. Long's writ application on May 7, 1992, in an unpublished opinion.
[8] The instant suit was filed in Dr. Long's domicile, Caddo Parish. La. C.C.P. art. 42(1).
[9] By other interrogatories the jury found that the breach of the standard of care by Dr. Long caused $150,000 damage to Joseph Kavanaugh, but that the doctor's conduct caused no harm to Dorothy Kavanaugh.
[10] The court's ruling does not appear in the trial transcript but is stated in the written opinion on the plaintiff's motion for JNOV or new trial, R.p. 239.
[11] Although the Supreme Court's opinion in Short does not state whether "trial on the merits" would be by jury or judge, its broad language regarding trial of the exception would appear to apply to either situation. More recent cases favor allowing the jury to decide prescription if the evidence on the exception and on the merits would be the same. See, e.g., Anderson v. Collins, supra; Williams v. American Family Mut. Ins. Co., 520 So.2d 1082 (La.App. 3d Cir. 1987); Harvey v. Amoco Prod. Co., 96-1714 (La.App. 1st Cir. 6/20/97), 696 So.2d 672; see also Tichenor v. Roman Catholic Church, 95-0930 (La.App. 4th Cir. 12/14/95), 665 So.2d 1307, writ denied 96-0183 (La.3/15/96), 669 So.2d 424.
[12] A federal court has held that the three-year limitation for malpractice claims applies even to bar suits for intentional acts. Montagino v. Canale, 792 F.2d 554 (5th Cir. 1986). We find Montagino unpersuasive, however, in that it predates the assumption of Rajnowski and its progeny that the third category of contra non valentem will apply to medical malpractice cases.
[13] Justice Dennis voiced a similar view in his concurrence to the denial of rehearing in Rajnowski v. St. Patrick's Hosp., 564 So.2d at 682: "Specifically, the statute [9:5628] should be read to * * * leave intact our traditional rules of tolling or contra non valentem with respect to cases in which the doctor concealed or intentionally failed to disclose facts which would have given a patient notice of malpractice[.]"
[14] The jury's conclusion to the contrary is manifestly erroneous. The record is unequivocal that Dr. Long intended to operate at C5-6, but negligently operated at C6-7 instead; on the date of surgery he dictated several medical records plainly stating that he operated at C6-7; however, on June 4, after he reviewed the entire record, he changed several of the documents to conform to the original surgical plan. This is a strong showing that Dr. Long intentionally changed the records to conceal his error, and is not overcome by his denial of any knowledge of the error until 1991.