769 So.2d 94 (2000)
Vedelia D. BIONDO
v.
Andrew C. BIONDO.
No. 99 CA 0890.
Court of Appeal of Louisiana, First Circuit.
July 31, 2000.
*97 Leslie J. Clement, Jr., Thibodaux, for Plaintiff-Appellant Vedelia D. Biondo.
Daniel A. Cavell, Morvant & Cavell, Thibodaux, for Defendant-Appellee Andrew C. Biondo.
Before: SHORTESS, C.J., PARRO, and KUHN, JJ.
*98 PARRO, J.
Vedelia D. Biondo (Vedelia) appealed from the trial court's judgment in an action to partition the community property, which existed between her and her former husband, Andrew C. Biondo (Andrew). For the following reasons, this court amends in part, affirms in part, reverses in part, renders in part, and remands.

Facts and Procedural History
Vedelia and Andrew were married in 1953. During their marriage, Vedelia inherited money from several members of her family. The parties had never entered into a prenuptial agreement prior to the existence of their community, nor had the parties ever petitioned the court to terminate the legal regime. Furthermore, there had never been a declaration filed by either party reserving, as their separate property, the natural and civil fruits of their separate property.
In 1997, a judgment of divorce was rendered pursuant to a petition for divorce filed by Vedelia. Subsequently, Andrew filed a petition seeking to partition the property belonging to the former community. In his sworn detailed descriptive list of property, Andrew included immovable properties located on Magnolia Street and Debbie Street in Thibodaux, Louisiana, and on Fieldcrest Drive in Schriever, Louisiana, as well as the mobile homes located on the Debbie Street and Fieldcrest Drive properties, various bank accounts, debts owed to them by three of their children, and a policy of life insurance issued by John Hancock Life Insurance Company (Hancock). As community liabilities, his list disclosed the debts owed on five credit cards and on loans from three finance companies. Vedelia responded by filing a sworn descriptive list and traversed Andrew's list. According to Vedelia, the following assets claimed by Andrew to be community property were her separate property: Magnolia Street property, Debbie Street property, various bank accounts in her name only, debts owed by three of their children, and the Hancock life insurance policy.
At the parties' request, a hearing was conducted on the issue of the classification of the property.[1] After this hearing, the trial court found that Vedelia had inherited money from various individuals and had received money from a personal injury settlement during their marriage which constituted her separate property. However, the trial court further found that her separate funds had been commingled with the community funds and had lost their separate character. Furthermore, the court ruled that the 1985 "sale" of the Magnolia Street property and the 1987 "sale" of the Debbie Street property were simulations and failed for lack of consideration based on a determination that community funds were used in purchasing this property, which belonged to the community. Based on a finding that Vedelia failed to overcome the presumption of community, the trial court signed a judgment declaring all of the assets and liabilities in question to be community property.[2] Vedelia filed a motion for new trial, which was denied by the trial court. Subsequently, Vedelia appealed, contending the trial court erred in failing to give legal effect to the (1) assignment of the life insurance policy in 1974, (2) voluntary partition of the community in the early 1980s, (3) sale relating to the Magnolia Street property in 1985, and (4) sale relating to the Debbie Street property and donations of the mobile homes located on this property in 1987. Vedelia also submits the *99 trial court erred in finding that she had commingled her separate funds, in declaring that the loans to their children were community assets, and in declaring that the loans from several finance companies and debt owed on various credit cards were community liabilities.

Applicable Law and Standard of Review
Under Louisiana law, property of married persons is generally characterized as either community or separate. LSA-C.C. art. 2335. The classification of property as separate or community is fixed at the time of its acquisition. Smith v. Smith, 95-0913 (La.App. 1st Cir.12/20/96), 685 So.2d 649, 651. In proving whether an asset is community or separate, the parties are guided by the following principles.
LSA-C.C. art. 2338 provides that community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property. Things in the possession of a spouse during the existence of the community are presumed to be community, but either spouse may prove that they are separate property. LSA-C.C. art. 2340.
Regarding the classification of property as separate, LSA-C.C. art. 2341 provides, in part, that a spouse's separate estate comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually; and things acquired by a spouse as a result of a voluntary partition of the community during the existence of a community property regime.
The trial court's findings regarding the nature of the property as community or separate are factual determinations. Harvey v. Amoco Production Company, 96-1714 (La.App. 1st Cir.6/20/97), 696 So.2d 672, 677. The appellate court's review of fact is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882; Morris v. Norco Construction Company, 632 So.2d 332, 335 (La. App. 1st Cir.1993), writ denied, 94-0591 (La.4/22/94), 637 So.2d 163.

Voluntary Partition
During their marriage, Andrew was the principal income earner for the *100 family. He involved himself in many ventures in an effort to raise money. Some were successful; others were not. The evidence shows that the family finances were managed by Vedelia. Marital discord, particularly regarding family finances, began in the late 1970s. In the early 1980s, the parties began to sell the offshore rental trailers because they were having problems renting them due to a decline in the oilfield industry. At that point, the parties agreed to divide the proceeds from the various sales. Around this same time, the parties began to divide, after payment of community expenses, rental income from rental properties. Vedelia generally saved most of the money she received as a result of this division. She asserts that the oral agreement between them constituted a partial partition of their community property on a monthly basis and the portion of the income received by her is her separate property.[3] Therefore, she maintains that the trial court erred in declaring that such property belonged to the community.
With one notable exception, spouses are generally capable of contracting with each other. For example, spouses are free to enter into sales. The only exception to the spouses' general capacity to contract with each other involves modification or termination of the matrimonial regime, which requires judicial approval. Katherine S. Spaht, Matrimonial Regimes, 42 La. L.Rev. 347, 348 (1982). Because spouses must have judicial approval of a matrimonial agreement that modifies or terminates a matrimonial regime, a distinction between an agreement "establishing a regime of separation of property or modifying or terminating the legal regime" and a contract which has the effect of changing the classification of property is important. Spaht, Matrimonial Regimes, 42 La. L.Rev. at 348-349.
A matrimonial regime is a system of principles and rules governing the ownership and management of the property of married persons as between themselves and toward third persons. LSA-C.C. art. 2325. The reference to a "system" contemplates a "methodic arrangement of rules" rather than an isolated or single transaction; thus, a matrimonial agreement affects the classification and management of future property. Katherine S. Spaht and W. Lee Hargrave, Matrimonial Regimes § 8.6 at 528, in 16 Louisiana Civil Law Treatise (1997).
The legal regime of community of acquets and gains applies to spouses domiciled in this state. LSA-C.C. art. 2334. Spouses are free to establish by matrimonial agreement[4] a regime of separation of property or modify the legal regime as provided by law. LSA-C.C. art. 2328. Such an agreement may be entered into before or during marriage as to all matters that are not prohibited by public policy. LSA-C.C. art. 2329. However, during the marriage, spouses may modify or terminate a matrimonial regime only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules.[5] LSA-C.C. art. 2329. The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect. LSA-C.C. art. 2328.
In this case, there was no prenuptial agreement between the parties. Therefore, the legal regime of a community of acquets and gains governed the ownership and management of the property of *101 Andrew and Vedelia as between themselves and toward third persons. See LSA-C.C. art. 2327, comment (a). Thus, Vedelia and Andrew each owned a present undivided one-half interest in the community property. See LSA-C.C. art. 2336. By matrimonial agreement, Vedelia and Andrew could have provided for contribution to the expenses of the marriage, for apportionment of community property according to fixed shares, or for the reservation of fruits as separate property. See LSA-C.C. art. 2330, comment (d). Furthermore, they could have provided that their existing or future property would be subject to something other than the legal regime. See LSA-C.C. art. 2330, comment (d).
Vedelia contends that she and Andrew voluntarily partitioned community funds during their marriage by an oral agreement to share income equally once common expenses were paid. It is undisputed that the income sharing began in the early 1980s and continued until their physical separation in 1997. LSA-C.C. art. 2336 authorizes spouses to voluntarily partition the community property in whole or in part without court approval. Following a voluntary partition, the community assets that were partitioned become the separate property of the acquiring spouse. LSA-C.C. art. 2336; Spaht and Hargrave, Matrimonial Regimes § 8.12 at 554. The fruits and revenues of such property fall into the community unless their separateness is reserved in accordance with LSA-C.C. art. 2339. See LSA-C.C. art. 2336, comment (a). Third persons may treat the property as community until registry. LSA-C.C. art. 2336. As between the spouses, registry is unnecessary for the effectiveness of a voluntary partition. Partition of all community assets does not of itself terminate the community regime between the spouses. All debts and all future assets will continue to be governed by the regime unless a matrimonial agreement is contracted to provide otherwise. See Spaht and Hargrave, Matrimonial Regimes § 8.12 at 554.
LSA-C.C. art. 2336 does not specify any formal requirements for a voluntary partition of the community. Thus, the general rules regulating the formality and recordation for conventional obligations would apply. Spaht, Matrimonial Regimes, 42 La. L.Rev. at 351. Unless the partition affects immovable property, there is no formality requirement. Spaht and Hargrave, Matrimonial Regimes § 4.14 at 219 n. 3. Absent documentary evidence of a voluntary partition, the self-serving testimony of the spouses will have to be supported by objective evidence to overcome the presumption of community. Spaht and Hargrave, Matrimonial Regimes § 4.14 at 219.
Since the property in question was not an immovable, the lack of an authentic act or act under private signature would not have rendered a voluntary partition unenforceable. However, by their oral agreement, Vedelia and Andrew attempted to do more than simply partition existing community funds. The evidence shows that they intended, by their agreement, to affect community funds received in the future. Under the law, such a sharing of income was clearly permissible but only as a modification of the legal regime, thus requiring the execution of a matrimonial agreement subject to judicial approval. See Ducote v. Ducote, 442 So.2d 1299, 1303 (La.App. 3rd Cir.1983), writ denied, 445 So.2d 439 (La.1984).
An oral matrimonial agreement is unenforceable as LSA-C.C. art. 2831 requires the matrimonial agreement be made by an authentic act or by an act under private signature duly acknowledged by the spouses. See Spaht and Hargrave, Matrimonial Regimes § 8.7 at 530. Therefore, we conclude the oral agreement is void for failure of the parties to comply with the form requirements of LSA-C.C. art. 2331.[6] *102 See Washington v. Washington, 471 So.2d 925, 927 (La.App. 2nd Cir.1985). Accordingly, the trial court's finding that the income generated from community-owned rental properties and the sale of community-owned offshore rental trailers was community property is reasonably supported by the record and is not manifestly erroneous.

Life Insurance Policy
In the early 1970s while the parties were married, they purchased a policy of life insurance from Hancock with a face value of $60,000 on Andrew's life. While life insurance is generally considered sui generis under Louisiana law, it is the proceeds of the life insurance policy, not the policy itself, which are not subject to claims of the community. Kambur v. Kambur, 94-775 (La.App. 5th Cir.3/1/95), 652 So.2d 99, 102; see T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834, 845 (La.1975). There is a clear distinction between the ownership of a policy of life insurance and the right to receive the proceeds of a life insurance policy after the death of the insured. Kambur v. Kambur, 652 So.2d at 103. The issue of the ownership of the life insurance proceeds is not before us today. The Hancock policy was acquired during the marriage and the existence of the legal regime and is presumed to be community property. See LSA-C.C. art. 2340.
On March 20, 1974, Andrew executed an "Absolute Assignment" in favor of Vedelia. This document provided:
For "Love and affection", all right, title and interest, and ownership and control of the undersigned assignor or assignors in this policy issued by the John Hancock Mutual Life Insurance Company with all benefits, rights and privileges provided under the policy, are ASSIGNED AND TRANSFERRED to: Vedelia D. Biondo ... hereby designated as the Assignee, and, if the policy includes a provision for designation of Owner, hereby designated as the Owner subject, however, to the conditions and provisions of the policy ....
In this document, Andrew directed Hancock to continue the current premium billing. Only Andrew's signature appears on this document. In light of this assignment, Vedelia contends that the policy, which had a stipulated current cash surrender value of $17,264.45, is her separate property. Thus, we must determine if Vedelia proved that by signing the instrument Andrew severed his community interest and thereby vested his wife with a separate property interest in the full policy.
Property possessed by either spouse during the existence of a legal regime is presumed to be community. LSA-C.C. art. 2340. Additionally, property purchased with community funds during the marriage is presumed to be community even though title is taken in the name of one spouse only. See LSA-C.C. art. 2338; Noil v. Noil, 96-2167 (La.App. 1st Cir.9/19/97), 699 So.2d 1134, 1137. The presumption of community may be overcome by proving that the things are separate property. LSA-C.C. art. 2340.
Although Andrew executed an assignment in favor of Vedelia, he instructed Hancock to continue the current premium billing. Vedelia explained that she continued to use community funds to pay the annual premiums. According to Vedelia, Andrew named her as owner of the policy for tax reasons. This evidence established as a permissible view that Vedelia simply held the title to the policy as agent for the community. Furthermore, Vedelia failed to prove a valid donation inter vivos by Andrew of his community interest in the Hancock policy. After considering the evidence presented on this issue, we are unable to find error in the trial court's determination that Vedelia failed to overcome the presumption of community with respect to the Hancock policy.

*103 Commingling of Separate Funds

The trial court found that Vedelia had separate property as a result of money she had inherited from various family members and money she had received from a personal injury settlement. Vedelia testified that during their marriage, she received a total of $21,082.92 by way of inheritance.[7] Her 1978 personal injury settlement totaled $3,485.
Vedelia presented evidence that several bank accounts were in her name only, which she argues are her separate property. These included a checking and a savings account at Union Planters Bank (Union), formerly Acadian Bank, and a savings account at Hibernia National Bank (Hibernia), formerly Argent Bank. The correctness of the trial court's classification of these accounts will be discussed separately.

A. Savings Account with Union
In her brief, Vedelia states that the money deposited in her savings account at Union consisted of money she received from inheritance, from a personal injury settlement, from her share of their income dating back to 1980, and from one of their sons as repayment of a loan. At the termination of the community, the balance in this account was $11,946. The money she received from inheritance and all or part of the money received from a personal injury settlement was clearly her separate property. See LSA-C.C. arts. 2341 and 2344.[8] However, as previously determined, that portion of the funds derived from their sharing of income dating back to 1980 was community property.
The mere mixing of separate funds and community funds in a bank account does not of itself convert the entire account into community property; only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all the funds characterized as community funds. Curtis v. Curtis, 403 So.2d 56, 59 (La.1981). Thus, where separate funds can be traced with sufficient certainty to establish the separate ownership of property paid for with those funds, the separate status of such property will be upheld. Landwehr v. Landwehr, 547 So.2d 752, 755 (La.App. 4th Cir.1989).
At various times during their marriage, money from the Union savings account was loaned to the community, to Andrew, and to one of their sons. She testified that in 1969, she used approximately $4,600 of the money she had inherited from her mother to purchase a car. She explained that the money was repaid with community funds. In 1985, she used $15,000 from this account to loan to Andrew. Vedelia testified that the $15,000 came from the sale of offshore rental trailers. Accordingly, the $15,000 loaned to Andrew in the transaction relating to the Magnolia Street property came from the community portion of the funds deposited in Vedelia's Union savings account.
In 1987, $9,975 was admittedly advanced to Andrew in conjunction with the transaction involving the Debbie Street property. According to Vedelia, she also advanced Andrew approximately $7,125 in conjunction with the 1987 alleged donation of the four mobile homes situated on the Debbie Street property. Vedelia submits that the $17,100[9] advanced to Andrew in 1987 came from the money she had received from her inheritance and settlement. She maintains that no portion of this amount was ever repaid by Andrew. The separate portion *104 of this account consisted of at most $24,567.92 ($21,082.92 from her inheritance plus $3,485 from her personal injury settlement).[10] Assuming the facts as stated by Vedelia to be true, only $7,467.92[11] in her Union savings account would have been traceable to her separate property. Yet, Vedelia contends that in 1992 she loaned her son, James, approximately $12,000 of what she considered to be her separate property to assist in his purchase of an airplane. She testified that she used the money from her inheritance and the accumulated interest on these funds to finance the loan. According to Vedelia, this loan was repaid upon the subsequent sale of the airplane, and the money was returned to her Union savings account. Thereafter, she would periodically advance money to James for living expenses. These advances totaled $9,700. She explained that all but $1,500 of this amount came from her Union savings account and that this money had come from the income that had been split monthly. The entire advanced amount remained unpaid.
This evidence shows that through the years, withdrawals of her separate funds were made from the Union savings account, reimbursement of portions of her separate funds were deposited in the same account, interest on these funds had been deposited, and community funds were also deposited and withdrawn from it. It was this activity, rather than the trial court's disbelief of Vedelia, that served as the basis of the trial court's finding that her separate funds had been commingled with the community funds and had lost its separate character.
Vedelia's placement of community funds into an account in which her separate funds were deposited was insufficient to convert her separate funds into community property. Such a conversion would have occurred only if her separate funds were commingled indiscriminately so that the separate funds could not be identified or distinguished from the community funds. Vedelia established the source and origin of the funds in the Union savings account and expenditure of those funds. Andrew did not dispute that $24,567.92 of the money in the Union savings account was Vedelia's separate property when received and placed in the account. Nor did he dispute her explanation of how the money in that account had been used.
Based on our review of the record, we conclude that Vedelia established the separate nature of $7,467.92 of the total balance of $11,946 that remained in the Union savings account by tracing the activity of this account with sufficient certainty. Therefore, the trial court's classification of the entire account as community property was not supported by the record and is manifestly erroneous. Accordingly, we find that $7,467.92 of the balance in this account constitutes Vedelia's separate property. On the contrary, the record supports the classification of only $4,478.08 of the funds in this account as community property.[12] To the extent the trial court judgment classified these funds as community property, we are unable to find manifest error.

B. Checking Account with Union
After 1987, Vedelia collected all of the income from the rental of the mobile homes situated on the Debbie Street property. She used this income to pay community living expenses, including household expenses, repairs and maintenance of properties, her hospitalization insurance, and medical bills. She explained *105 that the remainder of the rental income was kept in her Union checking account. In the absence of evidence of any other source of the funds, we note that the classification of money in this account does not present a question of commingling. We find error in the trial court's determination that the funds in her checking account were community property on the basis of commingling. However, in light of this court's resolution of the issues related to the classification of the Debbie Street property, as discussed later in this opinion, we find no manifest error in the trial court's classification of the funds in her checking account as community property.

C. Savings Account with Hibernia
At trial, Vedelia testified that she opened a savings account at Hibernia in January 1996 in which to deposit her Social Security checks. In light of the parties' failure to properly modify the legal regime, we find no manifest error in the trial court's classification of the funds in her Hibernia savings account as community property. See LSA-C.C. art. 2338.

Magnolia Street Property
The parties executed an act of sale between themselves dated August 21, 1985, with respect to their Magnolia Street property on which the family home was located. This act reflects a sales price of $15,000; however, Vedelia characterized the transaction as a loan from her portion of the post-tax profits on the sale of some of the parties' assets. She explained that the purported transfer of Andrew's interest in the Magnolia Street property was intended as her security for the loan. Accordingly, Vedelia does not challenge the trial court's classification of the Magnolia Street property as community property. Instead, she seeks repayment of $15,000 based on her allegation that Andrew never attempted to repay any of this money which he arguably used to benefit his separate estate. She requests that the $15,000 loan of her allegedly separate funds be classified as a separate debt of Andrew payable to her separate estate. Alternatively, if found to have been used for community purposes, she urges this court to award her reimbursement for one half of the borrowed amount.
Andrew testified that he was involved in the used car business in 1985 and became delinquent on bank loans. According to Andrew, the $15,000 was borrowed from Vedelia to help with the indebtedness related to this business venture. He explained that there was no method for repayment of the loan amount.
After reviewing the evidence and considering its ruling on the voluntary partition issue, the trial court found that this transaction was a sham and totally disregarded the sale based on a finding that the loaned funds were community property and were used to satisfy a community debt. In light of our affirmance of the trial court's ruling on the voluntary partition issue, we are unable to find error in the trial court's refusal to classify the $15,000 loan amount as Vedelia's separate asset or to recognize a right to reimbursement for one half of that amount.

Debbie Street Property
As previously noted, Andrew approached Vedelia in 1987 for more money. This time the cash advance by Vedelia was tied to a sale of Andrew's undivided one-half interest in the Debbie Street lot, which was used as rental property. On November 13, 1987, the parties signed an act of sale which purported to transfer Andrew's interest in the Debbie Street lot to Vedelia for $9,975. The trial court disregarded this act of sale based on a finding that the money given as consideration for the underlying sale belonged to the community. This determination was premised on its earlier finding that Vedelia's separate funds had been commingled and its classification of the entire account as community.
*106 After considering the uncontradicted evidence presented at trial, we previously concluded that by tracing the activity in her Union savings account, Vedelia met her burden of proving that her separate funds were not commingled indiscriminately and they remained identifiable from the community funds. In light of this finding and Vedelia's uncontroverted testimony that the $9,975 advanced to Andrew was from the money she had received from her settlement and inheritance, we find that the trial court manifestly erred in concluding that Vedelia used community funds as consideration for this sale.
Andrew submits that the paperwork for this transaction is identical to the act involving the Magnolia Street property. However, this court notes that the two acts in question are distinguishable in that the 1987 cash sale states:
It is understood by the parties herein that this transaction is paid for from separate and paraphernal funds of the Vendee, Mrs. Vedelia Duet Biondo.
A husband who joins in a deed declaring that his wife is buying property for her separate estate with her separate funds cannot later dispute the separate nature of the property. Gautreau v. Gautreau, 96-1548 (La.App. 3rd Cir.6/18/97), 697 So.2d 1339, 1350, writ denied, 97-1939 (La.11/7/97), 703 So.2d 1272; see LSA-C.C. art. 2342.
In this case, the declaration provides that Vedelia purchased Andrew's ownership interest in the lot with her separate funds. Andrew concurred with the declaration by placing his signature on the act as seller. Therefore, he cannot controvert the declaration that Vedelia acquired the property with her separate funds. See LSA-C.C. art. 2342. Moreover, since LSA-C.C. art. 2341 declares that separate property of a spouse comprises property acquired with separate things, we find that the Debbie Street lot is the separate property of Vedelia. Accordingly, we conclude the trial court erred in classifying the lot as community property.
Along with the act of sale, the parties purportedly entered into a separate act of donation with respect to the four mobile homes situated on the Debbie Street lot and available for rental. Vedelia contends that she gave Andrew $7,125 from her separate funds as consideration for the donations. This contention was denied by Andrew. Andrew testified that the donations were executed simply to identify Vedelia as the registered owner of the mobile homes. According to Andrew, in substituting the name of the registered owner of the mobile homes, they did not wish to change the characterization of the mobile homes from community property to separate property. He explained that the transactions were admittedly styled as donations instead of sales to avoid the payment of sales taxes. His testimony is supported by the following language in the acts of donation:
This affidavit is made for the purpose of requesting [exemption] of Sales or Use Tax on a bona fide donation and the undersigned attest to the fact that there was no consideration involved.
Furthermore, the parties continued to use community funds to maintain these mobile homes. He explained that although the rent was placed in one of Vedelia's accounts, he understood that his one half of the rental income from this property was being used to repay Vedelia for the money she had advanced to him.
A donation inter vivos is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it. LSA-C.C. art. 1468. Such a donation must meet strict requirements of form. See LSA-C.C. art. 1467. As to the donation of an immovable or movable, corporeal or incorporeal, the general rule is the donation must be made by an act passed before a notary public and two witnesses. LSA-C.C. arts. 1536 and 1538. A codal exception to this general rule is found in LSA-C.C. art. 1539, which governs a manual gift. The manual *107 gift, that is, the giving of corporeal movable effects, accompanied by a real delivery, is not subject to any formality. LSA-C.C. art. 1539.
In the instant case, the acts of donation were executed by Vedelia and Andrew in the presence of a notary. They were not signed in the presence of two witnesses. Accordingly, the requirement of an authentic act was not complied with in this case. See LSA-C.C. art. 1538. In the absence of authentic acts, Vedelia must rely on proof of delivery as required by LSA-C.C. art. 1539. A donee of a manual gift must also show by strong and convincing proof that the donor had the intent to presently and irrevocably divest himself of the thing and that real delivery was made. Bergeron v. Bergeron, 411 So.2d 1183, 1187 (La.App. 4th Cir.1982). In this case, Andrew, the alleged donor, denied that a donation was intended by him. Even Vedelia's testimony regarding the giving of consideration in conjunction with the execution of the acts of donation cast doubt as to whether the requisite donative intent was present.
The trial court found that these transactions were a sham. In so finding, the trial court obviously determined that Vedelia had failed to establish the existence of intent necessary to support donations inter vivos. After reviewing the record and deferring to the trial court's determinations of credibility, we conclude this finding is reasonably supported by the record and is not manifestly erroneous. Therefore, we conclude the trial court did not manifestly err in classifying the four mobile homes as community property.
In light of our conclusions, we must consider Andrew's argument regarding the classification of the civil fruits of this property. That portion of the rent attributable to the leasing of the four community-owned mobile homes is obviously community property. See LSA-C.C. art. 2338. Andrew urges that, in the absence of a reservation of the civil fruits from the Debbie Street lot as separate property as required by LSA-C.C. art. 2339, the revenue generated from this property after the 1987 sale was also community property. This court agrees. Since Vedelia retained the rental income from this lot during this period of time, Andrew submits that he is entitled to an accounting of these funds. Vedelia testified that the income from the rental of the Debbie Street property (lot and four mobile homes) was deposited in her Union checking account, which the trial court determined to be community property, and used to benefit the community. This community-owned asset was partitioned by the trial court along with all of the other property belonging to the parties. Therefore, Andrew is owed no further accounting as to the funds in this account prior to the date of the partition.

Family Indebtedness
Vedelia contends that the debts owed by their sons, Craig, James, and Michael, are her separate property in that these loans were made by her from her separate funds. Thus, she maintains that the trial court erred in classifying these debts as community debts.
Vedelia testified that she loaned $14,000 to her son Craig during his four years of college. Of this amount, $4,000 was forgiven. Of the remaining $10,000, Vedelia testified that $3,500 remained unpaid. Although Vedelia challenges the trial court's classification of this debt, she testified at trial that the $3,500 balance was owed to both her and Andrew as a debt of the community. Therefore, we find no merit in her argument challenging the community classification of this asset.
In 1992, she loaned James approximately $12,000 to assist in his purchase of an airplane. She testified that she used her separate funds to finance the loan. This loan was repaid upon the subsequent sale of the airplane, and the money was returned to her Union savings account. Thereafter, she periodically advanced money *108 to James for living expenses. These advances totaled $9,700. She explained that all but $1,500 of this amount came from her Union savings account from funds derived from their income-splitting agreement. The entire amount of this loan remained unpaid. In light of this court's resolution of the voluntary partition issue, we conclude the record reasonably supports the trial court's finding that the advances to James were made with community funds and its classification of this indebtedness as a community asset. Furthermore, we find no manifest error in either of these findings.
Vedelia urges that the debt owed by their son Michael is also her separate property since the loan was made against the cash surrender value of the Hancock policy. Since she failed to prove the separate nature of the Hancock policy and its cash surrender value, we conclude that her argument concerning the trial court's classification of this asset lacks merit.

Credit Card Debt and Finance Company Loans
Towards the end of their marriage, Andrew incurred debt of approximately $30,000 via cash advances on five different credit cards and loans from three separate finance companies. The trial court determined that the amounts owed on the following were community obligations: AT & T Universal card, Acadian Bank Visa card, BellSouth Card Center card, First USA Visa card, Texaco Credit Card Center card, Commercial Securities loan, American General loan, and U.S. Financial Corporation loan. Vedelia contends that these debts are Andrew's separate obligations.
An obligation incurred by a spouse may be either a community obligation or a separate obligation. LSA-C.C. art. 2359. An obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation. LSA-C.C. art. 2360. Except as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations. LSA-C.C. art. 2361. An obligation incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse is a separate obligation. LSA-C.C. art. 2363. An obligation incurred for the separate property of a spouse to the extent that it does not benefit the community, the family, or the other spouse, is likewise a separate obligation. LSA-C.C. art. 2363.
Vedelia does not dispute that the debts in question were incurred during the existence of the community. Therefore, these debts were presumed to be community obligations pursuant to LSA-C.C. art. 2361. In order to rebut this presumption, Vedelia had to prove such debts were not incurred for the benefit of the community. In determining whether she met this burden, the trial court had to examine the uses to which the borrowed money was put. See McConathy v. McConathy, 25,542 (La.App. 2nd Cir.2/23/94), 632 So.2d 1200, 1206, writ denied, 94-0750 (La.5/6/94), 637 So.2d 1052.
Shortly before the parties separated, Andrew purchased a mobile home for $1,500. This mobile home was registered in Andrew's name and placed in a vacant space on a lot where other community-owned mobile homes were situated for rental purposes. Vedelia testified that she did not learn of the purchase until three or four months after the fact; however, Andrew maintained that she was against the purchase of the mobile home. Vedelia contends that since the debts associated with the purchase, repair, and renovation of this mobile home were incurred without her permission, authority, or knowledge, they are not community obligations. This court disagrees. Under LSA-C.C. art. 2346, either spouse acting alone may manage, control, or dispose of community *109 property unless otherwise provided by law. Comment (a) to Article 2346 states in part:
This provision establishes the principle of equal management of community property. Each spouse has the right to manage community property without the consent or concurrence of the other spouse unless otherwise provided by law.
The exceptions specifically provided by law are set forth in LSA-C.C. arts. 2347 and 2349, none of which apply to the instant case. Thus, legally, Andrew had the managerial authority to incur a community obligation, notwithstanding the lack of Vedelia's consent or concurrence. See First Security Bank and Trust Company v. Dooley, 480 So.2d 842, 843-844 (La.App. 2nd Cir.1985).
Vedelia believed the mobile home was Andrew's separate property based on representations he allegedly made to her that his separate funds were used in the purchase. The record is devoid of any evidence that Andrew possessed any separate property during their marriage. On the other hand, Andrew considered this mobile home to be community property like all the other mobile homes the parties had purchased in the past for rental purposes. In light of the evidence presented, this court concludes that the trial court's finding that this mobile home was community property is reasonably supported by the record and is not manifestly erroneous.
Andrew testified that the AT & T Universal card, Acadian Bank Visa card, BellSouth Card Center card, and First USA Visa card indebtedness was associated with the remodeling and repair of this mobile home. Vedelia does not dispute that extensive repairs were performed on this mobile home. Nor does she dispute that the Texaco Credit Card Center card debt was for gasoline purchased for his community-owned automobile. Accordingly, the use of the borrowed sums for purchasing gasoline and for repairing and remodeling the community-owned mobile home reasonably supports the trial court's apparent factual finding that the underlying obligations were incurred for the common interest of the spouses and thus were community obligations. See First Security Bank and Trust Company v. Dooley, 480 So.2d at 844; see also Cabral v. Cabral, 543 So.2d 952, 954 (La.App. 5th Cir.), writs denied, 548 So.2d 328, 332 (La.1989). Furthermore, this court is unable to find error in the trial court's finding that Vedelia simply failed to rebut the presumption of community with respect to amounts owed on the AT & T Universal card, Acadian Bank Visa card, BellSouth Card Center card, First USA Visa card, and Texaco Credit Card Center card, as well as the U.S. Financial Corporation loan.
The loans with Commercial Securities and American General were admittedly made for purposes of obtaining money for gambling. Andrew explained that Vedelia accompanied him on gambling trips 75 to 80 percent of the time and that she participated in gambling. He acknowledged that Vedelia would generally allow herself only $25 with which to gamble. And, one time, Andrew gave Vedelia $100 of his winnings with which to gamble. Only these limited facts are of record for this court to consider in determining whether Vedelia rebutted the presumption of community with respect to these two loans. The record does not contain the loan documents or any other evidence that reveals the principal amounts of these loans, the principal balance at the time of trial, or the amount of Andrew's winnings and losses. In the absence of such evidence, we conclude the trial court did not err in finding that Vedelia failed to overcome the Article 2361 presumption with respect to the Commercial Securities and American General loans.

Decree
For the foregoing reasons, the judgment of the trial court is amended to reflect the mixed nature of the $11,946 in the Union *110 Planters Bank savings account in Vedelia's name as follows: $7,467.92 is Vedelia D. Biondo's separate property and $4,478.08 is community property. That portion of the judgment declaring the Debbie Street lot to be community property is reversed. Judgment is rendered declaring this lot to be the separate property of Vedelia D. Biondo. In all other respects, the judgment of the trial court is affirmed. This matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. Costs of this appeal are assessed to the parties equally.
AMENDED IN PART, AFFIRMED IN PART, REVERSED IN PART, RENDERED IN PART, AND REMANDED.
NOTES
[1] After a judgment was signed on the classification issue and stipulations were entered as to the value of the assets and liabilities, a trial on the partition of the property was conducted.
[2] The parties jointly stipulated that this judgment did not constitute a final judgment and expressly reserved Vedelia's right to appeal this judgment following a final judgment in the case. Subsequently, the trial court signed a judgment partitioning the property belonging to the former community.
[3] Since January 1, 1980, the former prohibition against spouses contracting with each other during their marriage has been removed. See LSA-C.C. art. 2329, comment (a).
[4] A matrimonial agreement is a contract which establishes a regime of separation of property or modifies or terminates the legal regime. LSA-C.C. art. 2328.
[5] During the first year after moving into and acquiring a domicile in this state, spouses may enter into a matrimonial agreement without court approval. LSA-C.C. art. 2329.
[6] Furthermore, we note that their agreement is null for lack of court approval as required by LSA-C.C. art. 2329.
[7] She explained that she inherited $5,000 from her mother in 1969, $824.02 from her uncle in about 1978, and the following from her father: in 1984$3,158.90; in 1986 $9,600; in 1988$2,500.
[8] Damages due to personal injuries sustained during the existence of the community by a spouse are separate property. LSA-C.C. art. 2344.
[9] $9,975 + $7,125 = $17,100.
[10] According to LSA-C.C. art. 2339, the natural and civil fruits of the separate property of a spouse are community property. A spouse may reserve such fruits as his separate property by a declaration made in an authentic act or in an act under private signature duly acknowledged. LSA-C.C. art. 2339. Vedelia admitted that she never executed such an act; therefore, all of the interest earned on this account belonged to the community.
[11] $24,567.92$17,100.00 = $7,467.92.
[12] $11,946$7,467.92 = $4,478.08.